UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| VARRICK DYER | * | CIVIL ACTION NO. 24-1702 |
| | * | |
| VERSUS | * | DIVISION: 1 |
| | * | |
| CITY OF NEW ORLEANS AND | * | MAGISTRATE JUDGE |
| ROMAN NELSON, IN HIS OFFICIAL | * | JANIS VAN MEERVELD |
| CAPACITY AS SUPERINTENDENT OF | * | |
| NEW ORLEANS FIRE DEPARTMENT | * | |
| ********************************** | * | |

## ORDER AND REASONS

Before the Court is the Motion for Leave to Amend Complaint filed by Plaintiff, Varrick Dyer ("Dyer"). Rec. Doc. 32. For the reasons set forth herein, IT IS ORDERED that Dyer's Motion for Leave to File Amended Complaint is DENIED.

### BACKGROUND

Plaintiff Varrick Dyer is an African American man who has been a firefighter employed by the City of New Orleans Fire Department ("NOFD") for over 20 years and has been serving as a Captain for 20 years. Dyer filed suit against Defendants, the City of New Orleans and Roman Nelson, in his Official Capacity as Superintendent of New Orleans Fire Department (collectively, "Defendants"), in this Court on July 7, 2024, Rec. Doc. 1, and filed his First Supplemental and Amending Complaint on August 7, 2024, Rec. Doc. 4. In his first amended complaint, Dyer alleged claims for retaliation under Title VII, hostile work environment based on race and color under Title VII, disparate treatment based on race under Title VII, and the foregoing claims under the Louisiana Employment Discrimination Law ("LEDL"), conspiracy to violate human rights under La. Rev. Stat. § 51:2256, conspiracy to interfere with civil rights under 42 U.S.C. § 1985(3), racial discrimination under 42 U.S.C. § 1981, and deprivation of a vested property right under 42 U.S.C.

§ 1983. The parties consented to proceed before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). Rec. Doc. 13.

On October 7, 2024, Defendants filed a Motion to Dismiss, Rec. Doc. 8, which this Court granted in part and denied in part on December 20, 2024, Rec. Doc. 15. In its order, the Court dismissed all of Dyer's claims for failure to state a claim except for Dyer's race-based disparate treatment claim as to two incidents: (1) when Dyer was charged with a more severe rule violation than another Caucasian captain arising out of a February 20, 2022 incident involving both Dyer and the Caucasian captain; and (2) when Dyer was denied a promotion that was allegedly given to a less qualified Caucasian male. Rec. Doc. 15 at pp. 15-16.

On January 17, 2025, this Court issued a scheduling order, directing all amendments to pleadings be filed by March 21, 2025. That same day, Defendants filed a motion for summary judgment, Rec. Doc. 20, and a few days later, on January 21, 2025, Defendants filed a motion to stay discovery pending resolution of Defendants' motion for summary judgment, Rec. Doc. 22. Both motions were set for submission on February 19, 2025. Rec. Doc. 24.

Thereafter, on March 21, 2025, the day amendments were due pursuant to the Court's scheduling order, Dyer filed a motion for leave to amend complaint. Rec. Doc. 32.

## I.    Dyer's Second Supplemental and Amending Complaint

Dyer now seeks leave to amend his complaint "to provide additional facts in support of his claims for racial discrimination under Title VII, and reassert his claims for retaliation and conspiracy that were dismissed." Rec. Doc. 32 at p. 1. While the Court will not again recount the factual allegations already provided in its order and reasons on Defendants' motion to dismiss, Rec. Doc. 15 at pp.1-5, it provides the following summary of Dyer's new factual allegations:

Dyer seeks to assert new facts surrounding the already-pleaded alleged harassment of him by another captain, Captain Favalora, and other Caucasian firefighters related to Dyer's refusal to boycott overtime work. Rec. Doc. 32-2 at ¶¶ 20, 22.[1] Dyer also adds that following his refusal to boycott overtime work, Captain Favalora recruited other Caucasian crew members to harass him, and the members would either refuse to communicate with him or walk out of the room whenever he entered. *Id.* at ¶ 23. Dyer alleges that other African American co-workers continued to treat him professionally and cordially. *Id.* at ¶ 24. As to the February 21, 2020 incident that Dyer has already asserted and the Court has already addressed in which another captain, Captain Favalora, cut the power to Dyer's treadmill and Dyer reported this to the Superintendent, Dyer now alleges that after he reported the harassment and assault to Superintendent McConnell on February 22, 2020, he "did not receive any assistance from the Superintendent in response to his complaint, but was required to sleep at another fire house to separate Dyer and Favalora." *Id.* at ¶ 28.

Dyer also now indicates that following his refusal to boycott overtime work, "[r]umors were spread about Dyer being violent and an 'angry black man,'" and that he was "ostracized by his Caucasian firefighters and was harassed on a near constant basis," including actions such as putting tacks in the tires of his bike and moving his chess pieces on the chess board when he left. *Id.* at ¶ 30. Dyer also now alleges that Captain Williamson, who Dyer already alleged brought an assault rifle to the engine house on November 21, 2022, did so because he "was attempting to intimidate Dyer by bringing the weapon in the fire house." *Id.* at 67. Dyer now indicates that "he reported the issue." *Id.*

---

[1] For ease of reference, in Dyer's first amended complaint, Dyer alleged that Captain Armand Favalora, a white male, began harassing Dyer to participate in a boycott of overtime work at the NOFD in early 2020. Dyer continued accepting overtime work, and he alleged that Favalora and other firefighters harassed him "for his refusal to participate in the boycott." Specifically, he alleged two specific incidents occurring in February 2020 involving Favalora swearing at Dyer and Favalora cutting the power to a treadmill Dyer was running on, causing Dyer to fall and injure his knee. Dyer alleged that he reported "the harassment and assault to Superintendent McConnel on February 22, 2020." *See* Rec. Doc. 4 at ¶¶ 19-23.

Dyer also adds a new incident related to a "Trump bumper sticker" that was placed on the back of his engine by an unknown individual on February 19, 2020. He alleges that "other Caucasian firefighters were aware that . . . Captain Dyer was a supporter of civil rights and racial equality," and "because of those beliefs, [they were aware that] Dyer was not a Trump supporter." *Id.* at ¶ 25. Despite this awareness, Dyer alleges that another African American co-worker notified him that a "Firefighter for Trump" bumper sticker had been placed on the back of the engine Dyer was assigned. *Id.* He then "took the bumper sticker to Chief Hardy and advised that he was suffering harassment from the other firefighters and Captain Favalora for working overtime." *Id.* at ¶ 26. He notes that at the time he complained to Chief Hardy on February 20, 2020, he "suspected that the harassment was also related to his race but did not make a specific complaint, fearing that his complaint would be ignored if he complained of racial discrimination, and he would suffer retaliation." *Id.*

As to the February 20, 2022 incident involving Captain Martin,[2] Dyer now adds that "he wasn't sure if [the two firefighters he was supervising] treated him with such disrespect because

---

[2]      For ease of reference, in Dyer's first amended complaint, Dyer alleged that on February 20, 2022, his engine responded to a fire that was no longer active when they arrived. He alleged that two Caucasian firefighters he was supervising left the truck, entered the building, and then returned to the truck, which he indicates was improper without instructions from him, their captain. As Dyer was leaving the fire scene, he received a call on the radio that he needed to return to the command post. When he arrived there, another captain at the fire scene, Captain Martin, drove by and yelled "next time get off the pump." When Dyer reported to the command post, he learned that Captain Martin had made the false call directing him to report there.

        Dyer then contacted Captain Martin to determine where he was going. Upon learning the location, Dyer went there, and an altercation between the two captains ensued. Before Dyer arrived, Martin allegedly called Deputy Chief Castle and claimed that he was fearful of Dyer. Castle did not instruct Dyer to not report to Martin's location. Instead, he called the District Chief and stated he thought there was going to be a fight. Dyer alleges on "information and belief" that Castle and Martin conspired to set up Dyer in a volatile situation in hopes he would turn violent, and Dyer would be terminated.

        For his role in the February 20, 2022 incident, Captain Martin was charged with violating Rule 24, which prohibits firefighters from engaging in hazing, horseplay, or pranks that interfere with another member's work performance or job satisfaction and from creating an intimidating, humiliating, or hostile work environment. He was issued the minimum discipline of a letter of reprimand. For Dyer's role in the incident, Dyer was initially charged with violating Rule 25, which prohibits threats or acts of violence against the public or other members and requires either suspension or termination of employment. However, after a hearing before the disciplinary review board in November

he is black or because they were so poorly trained," *id.* at ¶ 32, and that he testified during his civil service appeal on February 27, 2023, that he thought the two firefighters he was supervising left the engine and "disrespect[ed]" him "because he is black." *Id.* at ¶ 68. He also alleges that Captain Martin yelled "next time get off the pump" in front of other Caucasian firefighters. *Id.* at ¶ 35. Dyer makes further allegations that Deputy Chief Castle conspired with Captain Martin because when Captain Dyer called Captain Martin, Martin left out key information about the altercation, and Chief Castle immediately called the District Chief where Dyer was headed to report that he thought there would be violence. *Id.* at ¶ 40. Dyer adds that Chief Castle "could have told him to stand down," but instead did nothing to de-escalate the situation. *Id.* at ¶ 41. Dyer also makes several new allegations as to the context of the fight, including who was there, how Captains Dyer and Martin interacted with each other, and who turned in reports following the incident. Dyer provides that, "Martin committed the exact same conduct, yelling and cursing at Dyer, but was never disciplined for his actions of yelling and cursing at Dyer in the kitchen at the 502 quarters," *id.* at ¶¶ 42-51, 54, and he elaborates on the differences in charges between the two Captains and their consequences per NOFD guidelines, *id.* at ¶¶ 70-75.

And finally, as to his claim for disparate treatment with respect to NOFD's appointment of Captain Simon to an equivalent position created for him only, Dyer alleges that "Simon received a pay increase with this promotion/new title," and that "Dyer was never able to apply for the promotion, despite having more seniority as a captain and on a special operations unit than Simon." *Id.* at ¶ 95.

---

2022, the NOFD determined it would charge him with a violation of Rule 21 for failure to be courteous and respectful when dealing with other employees. Like Captain Martin, Dyer was issued a letter of reprimand.

## II.    Motion for Leave to Amend

In Dyer's Motion for Leave to Amend Complaint, Dyer seeks "to provide additional facts in support of his claims for racial discrimination under Title VII, and reassert his claims for retaliation and conspiracy that were dismissed." Rec. Doc. 32 at p. 1. In his motion, Dyer indicates that "no new entities are added to the Complaint and *allegations involve the same facts and set of facts previously asserted in his Original Complaint* [*i.e.* the First Supplemental and Amending Complaint], with additional factual support and clarity." *Id.* at pp. 1-2 (emphasis added). He also contends that no party would be prejudiced by the amended complaint. *Id.* at p. 3.

In opposition, Defendants contend that, because Dyer is attempting to "reassert" claims, Dyer's attempted amendment should not be evaluated under Federal Rule of Civil Procedure 15, but rather should be treated as a motion for reconsideration, which, they contend, is evaluated under Federal Rule of Civil Procedure 54(b) and is an "extraordinary remedy that should be used sparingly." *Castrillo v. Am. Home Mortg. Servicing, Inc.*, No. 09-4369, 2010 WL 1424398, at *4 (E.D. La. Apr. 5, 2010) (quoting *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004)). Defendants contend that "the general practice of courts in the Eastern District of Louisiana is to evaluate Rule 54(b) motions to reconsider interlocutory orders under the same standards that govern Rule 59(e) motions to alter or amend a final judgment." *Id.* at p. 2 (quoting *Hoffman v. Bailey*, No. 13-5153, 2015 WL 9315785, at *7 (E.D. La. Dec. 23, 2015)). Under Rule 59(e), courts consider four factors: "(1) whether the motion is necessary to correct a manifest error of law or fact upon which the judgement is based; (2) whether the movant presents newly discovered unavailable evidence; (3) whether the motion is necessary in order to prevent manifest injustice; or (4) whether the motion is justified by an intervening change in controlling law." *Id.* at p. 3 (citing *Hoffman*, 2015 WL 9315785, at *8). Defendants also contend that even if Dyer's motion were

6

evaluated under the Rule 15 standard, Dyer does not show just cause because he unduly delayed seeking leave to amend—filing his motion 91 days after the Court issued its order on Defendants' motion to dismiss, despite the fact that all of the new factual allegations have been available to Dyer since his Civil Service Hearing on February 27, 2023. *Id.* at p. 4. Defendants also contend that they would be unduly prejudiced because they "would be subject to unnecessary and burdensome discovery, forced to file renewed motions to dismiss and for summary judgment, and would have to deal with Plaintiff's unfair evolving facts and claims." *Id.* at p. 5. Defendants also contend that the changes made in the second amended complaint are futile. *Id.*

In reply, Dyer indicates that his motion to amend should be evaluated in accordance with Rule 15(a), but, in any event, the motion *could* be treated as a motion for reconsideration and evaluated under Federal Rule of Civil Procedure 59(b). Dyer argues that if this Court were to evaluate its motion as one for reconsideration, Defendants' reliance on a more stringent standard under Rule 59(e) is incorrect, as the Fifth Circuit has clarified that review of motions for reconsideration of interlocutory orders should be "more flexible," and the district court should "afford such relief from interlocutory judgments as justice requires." *Id.* at pp. 2-3 (quoting *Austin v. Kroger Texas, LP*, 864 F.3d 326, 336 (5th Cir. 2017)). But even if Dyer's motion to amend were converted to a motion to reconsider the Court's Order dismissing his retaliation and conspiracy claims and evaluated under the more rigid standard set forth in Rule 59(e), Dyer argues that such a motion should be granted to correct a manifest error in the law and prevent manifest injustice. On this point, Dyer contends that the Court applied the wrong standard in its order dismissing his claims pursuant to 12(b)(6) because it required Dyer to establish a prima facie case for his claims under the *McDonnell Douglas* evidentiary standard, which is not applicable at the motion to

dismiss stage. Rec. Doc. 38 at pp. 3-7. Dyer does not address Defendants' arguments that Dyer

does not satisfy Rule 15's standards.

### III.    The Quasi-Motion for Reconsideration

The Court notes that no party has filed a formal motion for reconsideration here. Instead,

Dyer merely responds to Defendants' argument that his motion to amend should be treated as a

motion for reconsideration and indicates that even *if* his motion to amend were treated as a motion

to reconsider and a heightened standard was applied, "[t]his Court's ruling related to Dyer's claims

for race discrimination and retaliation was an application of the wrong standard," as "almost every

case cited by the court in its ruling on Dyer's discrimination and relations [sic] claims were from

cases on appeal after a motion for summary judgment or trial." Rec. Doc. 38 at p. 7.[3] While the

Court declines to treat this piecemeal briefing as a formal motion for reconsideration, the Court

takes this opportunity to clarify its previous order relating to Dyer's Title VII claims pursuant to

Rule 54. *See* FED. R. CIV. P. 54(b) ("[A]ny order or other decision, however designated, that

adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment

adjudicating all the claims and all the parties' rights and liabilities.").

To be clear: in the Title VII context, a plaintiff need not make out a prima facie case of

discrimination or retaliation to survive a Rule 12(b)(6) motion. *Cicalese v. Univ. of Tex. Medical

Branch*, 924 F.3d 762, 766 (5th Cir. 2019); *Thompson v. Houma Terrebonne Housing*,  No. 18-

9394, 2019 WL 2524591, at *3 (E.D. La. June 19, 2019) (citing *Chhim v. Univ. of Tex. at Austin*,

836 F.3d 467, 470 (5th Cir. 2016); *Stone v. La. Dep't of Revenue*, 590 F. App'x 332, 339 (5th Cir.

---

[3] Dyer also appears to contend that the Court applied a heightened standard to his hostile work environment claim and his due process claim; yet, Dyer effectively concedes that he has no claims for hostile work environment or for violations of his due process rights, as he does not attempt to reassert these claims in his amended complaint. On the other hand, Dyer wholly fails to address Defendants' arguments that he is also seeking reconsideration of the Court's dismissal of his conspiracy claims via his amended complaint, and Dyer asserts no purported issue with the Court's dismissal of his conspiracy claims.

2014)); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) ("This Court has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss [in a Title VII case]."). Therefore, to the extent that this Court's previous order could be construed as requiring Dyer to make a showing of each prong of any prima facie test relating to his Title VII claims at the pleading stage, the Court revises its previous Order pursuant to Federal Rule of Civil Procedure 54 to clarify that such a requirement is not necessary at the pleading stage.

But this is the extent of the Court's revision. The Court's mere reference to any prima facie elements did not heighten the burden of proof for Dyer here, nor does the mere citation of cases in the summary judgment context necessarily indicate that the Court applied the wrong standard. *See Goings v. Lopinto*, No. 22-2549, 2023 WL 2709826, at *9 (E.D. La. Mar. 30, 2023) ("Although 'a plaintiff need not make out a prima facie case of [retaliation] in order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim,' the three prima-facie standard 'has some relevance at the motion-to-dismiss stage,' because in order to sufficiently state a Title VII-retaliation claim, 'a plaintiff must plead sufficient facts on all of the ultimate elements to make her case plausible.'") (quoting *Jenkins v. La. Workforce Comm'n*, 713 F. App'x 242, 244 (5th Cir. 2017)); *Chhim*, 836 F.3d at 470 (finding that although plaintiffs do "not have to submit evidence to establish a prima facie case of discrimination at [the motion to dismiss] stage, [they must] plead sufficient facts on all of the ultimate elements of a disparate treatment claim to make [their] case plausible."). Thus, the Court revises its previous order only to clarify that a plaintiff need not make out a prima facie case for his Title VII claims at the motion to dismiss stage; the Court still finds that its finding as to the dismissal of certain of Dyer's Title VII claims was proper here, as Dyer did not plead sufficient facts on the ultimate elements of these claims to make the claims plausible.

## IV.    Motion for Leave to Amend

With this revision addressed, the Court proceeds with the substantive arguments related to Dyer's Motion for Leave to Amend, which are properly addressed pursuant to Federal Rule of Civil Procedure 15. Under Rule 15(a)(2), when the time period for amending a pleading as a matter of course has passed, a party may amend its pleadings only by consent of the parties or by leave of court. "The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). Thus, the United States Court of Appeals for the Fifth Circuit instructs that the "district court must possess a 'substantial reason' to deny a request for leave to amend." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004). Nonetheless, leave to amend is "by no means automatic," and the "generous standard [of Rule 15] is tempered by the necessary power of a district court to manage a case." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (quoting *Halbert v. City of Sherman*, 33 F.3d 526, 529 (5th Cir.1994)); *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 177 (5th Cir. 2016) (quoting *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003)). Courts consider numerous factors when deciding whether to grant a motion for leave to amend, including: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the amendment." *Schiller*, 342 F.3d at 566. Additionally, and relevant here, "[a] litigant's failure to assert a claim as soon as he could have is properly a factor to be considered in deciding whether to grant leave to amend." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 864 (5th Cir. 2003). But "merely because a claim was not presented as promptly as possible . . . does not vest the district court with authority to punish the litigant." *Id.*

Further, the Fifth Circuit specifically instructs courts to "more carefully scrutinize a party's attempt to raise new theories of recovery by amendment when the opposing party has filed a motion for summary judgment." *Parish v. Frazier*, 195 F.3d 761, 764 (5th Cir. 1999) (citing *Little v. Liquid Air Corp.*, 952 F.2d 841, 846 and n.2 (5th Cir. 1992); *Addington v. Farmer's Elevator Mutual Ins. Co.*, 650 F.2d 663, 667 (5th Cir. 1981); *Freeman v. Continental Gin Co.*, 381 F.2d 459, 469-70 (5th Cir. 1967)). To be sure, however, "the Fifth Circuit has repeatedly stated that 'neither a motion to dismiss nor a motion for summary judgment extinguishes a plaintiff's right to amend a complaint.'" *Arceneaux v. State Farm Fire & Cas. Co.*, No. 06-3855, 2008 WL 11352619, at *1 (E.D. La. Dec. 10, 2008) (quoting *Zaidi v. Ehrlich*, 732 F.2d 1218, 1220 (5th Cir. 1984)).

A. <u>Undue Delay, Dilatory Motive, and Undue Prejudice to Defendants</u>

Dyer's argument for amendment under Rule 15 is limited. He merely provides, "[n]o party will be prejudiced," "the request is timely filed within the deadline for filing amended pleadings," and "[t]he limited factors for denying a motion for leave to amend a complaint are not present here." Rec. Doc. 32 at p. 3.[4] But Dyer glaringly omits that his motion for leave to amend was filed after Defendants filed a motion for summary judgment. And Dyer fails to address the fact that the new allegations provided in the amended complaint have been available to Dyer arguably since his civil service hearing on February 23, 2023, where Dyer's same counsel in this proceeding also represented him, *see* Rec. Doc. 36 at pp. 4-5 (citing Rec. Doc. 25-2, Dyer including transcript of February 23, 2023 civil service hearing as an exhibit), or, at minimum, since he filed his first amended complaint on August 7, 2024, Rec. Doc. 4. Dyer seemingly recognizes as such—at least with respect to his knowledge of these facts since he filed his first amended complaint on August

---

[4] Although Dyer filed a reply, Dyer only addressed the Defendants' argument that Dyer's motion should be converted to a Motion for Reconsideration. Rec. Doc. 38. Dyer wholly failed to address Defendants' arguments related to his inability to meet the requirements of Rule 15(a), which were also included in Defendants' opposition. *See* Rec. Doc. 36 at pp. 3-7.

7, 2024—because he states in his motion for leave that the "allegations involve the same facts and set of facts previously asserted in his Original Complaint." Rec. Doc. 32 at p. 2. Yet, Dyer did not move to amend to provide these already known facts until 226 days after his first amended complaint and 91 days after this Court's order on Defendants' motion to dismiss.

These facts alone, however, are not sufficient to support a finding that Dyer acted with undue delay or dilatory motive. While undue delay may be demonstrated when a movant attempts to allege new facts that "were known [to the movant] all along," more is generally required. *See C3PO Int'l. Ltd. V. DynCorp. Int'l, L.L.C.*, 663 F. App'x 311, 313-14 (5th Cir. 2016) (affirming district court's finding of undue delay because it was filed at a "late date," over one year after the first amended complaint, when the movant "knew the 'basic facts' supporting its new claims 'all along'"); *Rosenzweig*, 332 F.3d at 864-65 (concluding the district court did not abuse its discretion in denying leave to amend because plaintiffs had not raised any facts that were not previously available and Plaintiffs "deliberately chose to delay amending their complaint."). Indeed, as recognized by the Fifth Circuit, "delay alone is an insufficient basis for denial of leave to amend: The delay must be ***undue***, *i.e.*, it must prejudice the nonmoving party or impose unwarranted burdens on the court." *See Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004) (emphasis in original). Here, the mere fact that Defendants have already filed a motion for summary judgment is not conclusive proof of undue delay or dilatory motive. The trial of this matter is not until October 10, 2025, and discovery does not close until August 1, 2025. *See* Rec. Doc. 21. Additionally, this is only the second amendment Dyer seeks to file—the first being filed as matter of course pursuant to Federal Rule of Civil Procedure 15(a)(1)(A)—and it is within the Court's scheduling order deadlines. *Id.* And while Defendants ask the Court to impute a "tactical motive to delay a ruling on Defendants' Motion for Summary Judgment," Rec. Doc. 36 at p. 5, the

filing could just as well be interpreted as a response to the Court's previous dismissal order within the time permitted by its scheduling order. *See Global Oil Tools, Inc. v. Expeditors Int'l of Wash., Inc.*, No. 16-16372, 2018 WL 10246139, at *4 (E.D. La. Dec. 11, 2018) ("Global filed its motion for leave to amend within the deadline set by the scheduling order that is now in effect. The court does not find a dilatory motive."). Thus, on balance, the Court finds that there is no undue delay nor any dilatory motive here.

As to undue prejudice, the Court acknowledges that Defendants have already filed a motion for summary judgment (Rec. Doc. 20)—a fact that Dyer glaringly leaves out in his motion to amend. At the same time, however, Defendants filed their summary judgment motion fairly early in the case, before significant discovery has happened (*see* Rec. Docs. 22, 39) and only 28 days after this Court entered its order on Defendants' motion to dismiss (Rec. Doc. 15). Trial is not until October 10, 2025 (approximately five months away) and discovery does not close until August 1, 2025 (approximately three months away). This timeline does not suggest that Defendants will suffer from any undue prejudice. *See Global Oil Tools, Inc.*, 2018 WL 10246139, at *4 ("Although Expeditors and Zurich will face a new cause of action if Global's proposed pleading is allowed, trial is nearly four and a half months away, and the discovery deadline is in three and a half months. Expeditors and Zurich will not suffer undue prejudice."). The Court also recognizes that, if the parties have good cause to request an extension, there is nothing preventing the parties from seeking one here. Thus, the Court finds that there is no undue prejudice here.

## B.  Futility

Although not untimely filed and not unduly prejudicial, the Court finds that Dyer's proposed amendments would be futile. The Fifth Circuit has held that, "[i]t is within the district court's discretion to deny a motion to amend if it is futile." *Walker v. Travelers Cas. Ins. Co. of*

*Am.*, No. 07-7364, 2008 WL 11353711, at *1 (E.D. La. Mar. 12, 2008). To determine whether a complaint is futile, courts "apply the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872-73 (5th Cir. 2000) (citation and quotations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Walker*, 2008 WL 11353711, at *1 ("If the amendment would offer plaintiff no avenue of redress, there is no reason to allow it.").

Here, the Court has already issued a lengthy decision on Defendants' motion to dismiss Dyer's First Amended Complaint in which the Court found that Dyer stated a plausible claim for race-based disparate treatment as to two incidents but found that all other claims must be dismissed for failure to state a claim. Now, Dyer seeks to amend his Complaint to provide "additional facts" in support of his still pending disparate treatment claim and to "reassert his claims for retaliation and conspiracy that were dismissed." Rec. Doc. 32 at p. 1. But this amendment hardly presents any new information, and the new limited information does not make any material difference. Supported by the Fifth Circuit's repeated directive that "[a] busy district court need not allow itself to be imposed upon by the presentation of theories seriatim," the Court declines to permit leave here because such amendment would be futile. *Rosenzweig*, 332 F.3d at 865 (quoting *Freeman v. Continental Gin Co.*, 381 F.2d 459, 469 (1967)). The Court addresses each amended claim in turn.

### 1. *Retaliation Claim*:

To state a Title VII retaliation claim, a plaintiff must "allege facts that tend to establish: (1) she engaged in an activity protected by Title VII; (2) an adverse employment action occurred;

and (3) a causal link existed between the protected activity and the adverse action." *Richards v. JRK Prop. Holdings*, 405 F. App'x 829, 831 (5th Cir. 2010).[5]

Dyer seeks to reassert his claims for retaliation by now arguing that he engaged in the following additional protected activities: (a) he complained of harassment to Chief Hardy related to the Trump bumper sticker on February 20, 2020[6]; (b) he complained of harassment to Superintendent McConnell on February 22, 2020; (c) he participated in a disciplinary review board hearing on November 7, 2022, and advised that he was being treated unfairly due to prejudice and retaliation; and (d) he testified during his civil service hearing on February 27, 2023, that he believed the firefighters who disobeyed protocol did so because he is black. *Id.* at ¶ 100.[7]

As to the first two alleged protected activities, the same problems persist that the Court previously identified in its order on the motion to dismiss: Dyer does not allege that he communicated in his reports from February 2020 that the alleged treatment was *because* of his race or color.[8] In fact, as to at least the February 20, 2020 report relating to the Trump bumper sticker, Dyer specifically indicates that "he did <u>not</u> make a specific complaint" that the alleged

---

[5] Because "Louisiana's anti-discrimination statute, La. Rev. Stat. Ann. § 23:301 *et seq.*, is 'substantively similar' to Title VII, and Louisiana courts routinely look to the federal jurisprudence for guidance," the Court considers both Dyer's Title VII and LEDL retaliation claim under the same standard. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 n.4 (5th Cir. 2007). Additionally, "the law regarding [a] § 1981 retaliation claim tracks the Title VII jurisprudence." *Mendoza v. Helicopter*, 548 F. App'x 127, 129 (5th Cir. 2013). Thus, the Court considers Dyer's re-alleged § 1981 retaliation claim here as well.

[6] The Court notes that there appears to be a typo in the second amended complaint, as it provides: "Dyer engaged in protected activity, by opposing the disparate treatment and discrimination as described in preceding paragraphs, in particular when he complained of harassment to Chief Hardy related to the bumper sticker placed on Engine 07 on February 20, <u>2022</u>[,] and to the Superintendent on February 22, 2020." Rec. Doc. 32-2 at ¶ 100. The appropriate date for his complaint to Chief Hardy should be February 20, 2020. *See id.* at ¶ 26.

[7] Dyer also alleges that he engaged in protected activity when he filed an EEOC Charge of Discrimination on April 6, 2023, and amended the charge on October 9, 2023, alleging racial discrimination and retaliation. The Court has already considered whether Dyer alleged a plausible claim of retaliation following the filing of his EEOC Charge on April 6, 2023, and need not do so again here. *See* Rec. Doc. 15 at pp. 9-11.

[8] *See* Rec. Doc. 15 at p. 9 ("Although Dyer alleges that he reported the February 2020 'harassment and assault,' he alleges no facts that could support finding that this report referenced any unlawful employment practice because neither the allegations regarding the 'harassment and assault' nor the report itself implicate Dyer's race or color. He alleges no other complaints or reports concerning treatment he experienced, let alone race or color discrimination he experienced.").

harassment was related to his race. Rec. Doc. 32-2 at ¶ 26 (emphasis added). To the contrary, Dyer reported that the harassment was related to Dyer's decision to work overtime despite other firefighters' boycott of overtime work. *Id.* Lodging an internal complaint without reference to discrimination or harassment based on a protected characteristic, or at least alerting the employer that unlawful discrimination is at issue, is not sufficient to plausibly allege engagement in a protected activity. *See Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 21 (5th Cir. 2020) (affirming dismissal of retaliation claim because plaintiff "never indicated in his EEOC Complaint that he was subjected to such treatment because of his race, color, religion, sex, or national origin, nor does any document in the record suggest that this was the case."); *see also Carter v. Target Corp.*, 541 F. App'x 413, 418 (5th Cir. 2013) ("A vague complaint that does not reference a discriminatory employment practice does not constitute a protected activity.") (citations omitted); *Brown v. United Parcel Serv. Inc.*, 406 F. App'x 837, 840 (5th Cir. 2010) ("Magic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue."). This is particularly true when instead of alerting his employers that unlawful discrimination was at issue, Dyer indicates that he specifically indicated to at least one supervisor that he thought the harassment was *not* related to his race, but rather to his choice to work overtime. Rec. Doc. 32-2 at ¶ 26 ("Captain Dyer took the bumper sticker to Chief Hardy and advised that he was suffering harassment from the other firefighters and captain Favalora *for working overtime*.") (emphasis added). And he even admits that although he "suspected" that the harassment was also related to his race, he "did not make a specific complaint." *Id.*

Next, even assuming that the latter two incidents in November 2022 and February 2023 involving his participation in hearings qualify as protected activities, Dyer still must allege

sufficient facts to show that an adverse employment action occurred, and that action occurred because of Dyer's race. In evaluating whether the challenged action is materially adverse, courts look to whether the action "is harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

Dyer alleges that Defendants retaliated against him when: (a) Caucasian firefighters ostracized Dyer, treated him with disrespect, wouldn't talk to him, tried to instigate confrontations, and failed to follow his orders; (b) the NOFD changed Dyer's charge from a Rule 25 violation to a Rule 21 violation following his participation in the disciplinary review board hearing—a charge that was still a more severe violation than Captain Martin's charge; and (c) the NOFD issued a "punitive and excessive charge of violating Rule 35" on May 18, 2023, when, in Dyer's view, a Rule 36 violation with a less severe penalty would have been "more appropriate." Rec. Doc. 32-2 at ¶¶ 102-104. But, again, these allegations do not plausibly allege adverse employment action *because of his race*.

First, Dyer's general allegation that Caucasian firefighters treated him poorly does not indicate when these allegedly materially adverse activities occurred in relation to his alleged protected activity. "Courts regularly dismiss retaliation claims where plaintiffs fail to specify when an alleged adverse act occurred relative to their protected activity." *Lopez v. AT&T Mobility Servs. LLC*, No. 24-180, 2025 WL 600120, at *15 (W.D. Tex. Feb. 25, 2025) (collecting cases). Further, even assuming that these allegations followed Dyer's reports of discrimination in November 2022 and February 2023 (which the Court questions, at least with respect to some of the alleged mistreatment), these allegations do not rise to the level of materially adverse actions sufficient to state a claim. *See White*, 548 U.S. at 68 (holding that Title VII's antiretaliation provisions do not

protect employees from "petty slights, minor annoyances, and simple lack of good manners."). The Supreme Court is clear: Title VII's antiretaliation provision seeks to "prohibit[] employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,'" and a "simple lack of good manners will not create such deterrence." *Id.* (citation omitted). Dyer's complaints of other firefighters "ostraciz[ing] him, treat[ing] him with disrespect," not talking to him, "try[ing] to instigate confrontations, and fail[ing] to follow his orders," would not, objectively, dissuade a reasonable worker from participating in a protected activity, as Title VII is not a "general civility code for the American workplace." *Smith v. Miss. Transp. Com'n*, 586 F.3d 321, 332 (5th Cir. 2009) (rejecting very similar claims as adverse employment action). But to be sure, Dyer also fails to allege plausible facts that indicate that these acts can be attributed to actors who knew of Dyer's protected activities and were treating him poorly *because* of his engagement in these protected activities. In fact, Dyer fails to specifically identify the alleged bad actors, and he fails to indicate that any of these actors were aware of his protected activity in November 2022 and February 2023. Thus, Dyer fails to plead a plausible claim for retaliation related to the general mistreatment by other Caucasian firefighters.

Second, Dyer's claim that he was retaliated against because of his race when the NOFD changed his disciplinary charge to a *less severe* violation also fails. In his claim for disparate treatment, Dyer tellingly indicates that he "was initially charged with a severe rule violation that calls for termination, and after it became evident that NOFD had no evidence to support the rule violation did Nelson change the violation to Rule 21, failure to act with courtesy, and was issued a letter of reprimand." Rec. Doc. 32-2 at ¶ 93. Although this may have been a lesser charge than that given to a colleague (a claim that survived Defendants' motion to dismiss), Dyer fails to allege any facts that show how the NOFD's *downward variance* could dissuade a reasonable person from

engaging in the protected activity. Nor can a downward variance be characterized as an adverse action against him because of his engagement in a protected activity. In addition to the fact that the downward variance improved Dyer's situation, and thus could not be considered adverse, Dyer alleges the opposite. Dyer alleges that this change was because "it became evident that NOFD had no evidence to support the rule violation"—not as some sort of punishment for speaking up. *Id.* Thus, Dyer fails to state a claim for retaliation related to the NOFD's change in his disciplinary charge.

And finally, although the Court has already found that Dyer has failed to state a claim for retaliation related to the NOFD's charge of a Rule 35 violation against him, which prohibits lending, selling, or giving away property without permission, *see* Rec. Doc. 32-2 at ¶ 70, Dyer now contends that this violation was retaliatory because there was a "more appropriate" Rule 36 charge, which prohibits removing property without permission, *id.* at ¶ 72. But the mere fact that Dyer *believes* that there could have been a more appropriate charge brought against him does not change this Court's previous analysis that a Rule 35 violation charge "was not baseless"—as indicated by a review of the Civil Service Commission decision that is incorporated into the Complaint. *See* Rec. Doc. 15 at p. 10. Thus, because these new allegations do nothing to rebut this Court's finding that Dyer has failed to state a plausible claim for retaliation related to the Rule 35 violation, amendment would be futile.

In sum, Dyer's amendments fail to cure the deficiencies that this Court has already identified with respect to his retaliation claims, and Dyer's motion for leave to amend to reassert his retaliation claims is denied as futile.

2. *Conspiracy Claim:*

Dyer similarly reasserts his claim for conspiracy to violate human rights pursuant to La. R.S. 51:2256. The Court has already found that Dyer's bare allegations that Defendants' employees "acted in cohesion" is insufficient to plausibly establish a conspiracy, and that the mere fact that "[s]everal firefighters conferred when drafting special reports about the incident, is insufficient to give rise to the plausible existence of a conspiracy." Rec. Doc. 15 at pp. 17-19. Now, Dyer attempts to add factual allegations to support his claim for an alleged conspiracy. These again fall flat.

In his amended complaint, Dyer merely identifies additional Caucasian firefighters involved in the purported conspiracy, arguing that these new conspirers "took it upon themselves to wait for Dyer to arrive at the station house," and drafted incident reports "to be included in the investigation." *Id.* at ¶¶ 42-50, 127 (adding Chief Bourdais, Jones, Avery-Blood, Bishop, Massa, Laureano, Milderson, and Williamson as new conspirators). Specifically, as allegedly relevant to his conspiracy claim, Dyer now further provides that:

- On February 20, 2022, after Deputy Chief Castle called District Chief Salvaggio and before Dyer arrived at the station house, Captain Martin and Ryan Jones alerted Chief Salvaggio that Dyer did not enter the fire scene and was heading to the Station House to confront Captain Martin. ¶ 42.

- Others—specifically including alleged conspirator Jones, who worked under Captain Martin—waited at the station for Dyer to arrive because they allegedly "heard rumors that Dyer was violent." ¶ 43.

- The confrontation between Captains Martin and Dyer occurred, with no physical violence or threats of violence from Captain Dyer at any point. ¶ 44.

- Protocol directed the ranking officer or investigative officer of the incident to instruct individuals involved in the incident to complete special reports. ¶ 45.

- Jones and Avery-Blood were asked to draft special reports, which they did. ¶¶ 46-47.

- Martin testified in his civil service hearing that his statement in his special report that Dyer has a history of violence was "based on rumors with Captain Favalora." ¶ 48.

- Other Caucasian firefighters, Bishop, Massa, and Laureano, "made the decision that they wanted to draft special reports to be included in the investigation." ¶¶ 46-50.

But these new facts do not advance any theory that these individuals had any agreement against Dyer with any racial animus. *See* Rec. Doc. 15 at pp. 16-17. To the contrary, these facts merely indicate that fellow employees knew that an altercation may occur, witnessed Dyer confront Captain Martin, and made reports accordingly. The mere fact that employees waited to see whether an altercation would occur and wrote reports about such altercation does not plausibly establish a conspiracy to retaliate or discriminate based on Dyer opposing a practice made unlawful by the Louisiana Employment Discrimination Law. *See* La. Stat. Ann. § 51:2256(1). And as the Court has already found with respect to the April 2023 protected activity, *see* Rec. Doc. 15 at pp. 17, the purported conspiracy also occurred prior to Dyer participating in hearings in November 2022 and February 2023. Accordingly, Dyer still fails to state a plausible claim for conspiracy pursuant to La. R.S. 51:2256.

3. *Disparate Treatment Claim.*

The Court previously recognized that Dyer plausibly alleged that he could have faced disparate treatment because of his race by being charged with a more severe rule violation than Captain Martin and that he could have faced disparate treatment because of his race when the NOFD denied him a promotion that was allegedly given to a less qualified Caucasian male, Captain

Simon. Rec. Doc. 15 at pp. 15-16. Dyer's amended complaint now provides additional context to those claims and asserts new allegations with respect to disparate treatment on behalf of other Caucasian firefighters "after he refused Captain Favalora's demands for Dyer to boycott overtime work." Rec. Doc. 32-2 at ¶ 87.

But again, Dyer's proposed "additional factual support and clarity" does not provide any support for any new plausible disparate treatment claims. Rec. Doc. 32 at p. 2. And because the Court has already recognized that Dyer has stated a plausible claim for race-based disparate treatment as to Captain Dyer's and Martin's charged violations and to the promotion of an allegedly less qualified Captain Simon, the usefulness of any "clarity" as to the two already-recognized incidents would not make any material difference at the pleading stage. *See Matthews v. Stolier*, No. 13-6638, 2016 WL 3034160, at *2 (E.D. La. May 27, 2016) (evaluating amendment under Rule 15 and noting that, "if the Court allowed Plaintiffs to amend their Complaint each time they received additional discovery responses this case would remain mired in the pleading stage indefinitely."); *see also Jones v. S. Univ.*, 834 F. App'x 919, 922 (5th Cir. 2020) (unpublished) (affirming denial of leave to amend pursuant to Rule 15, in part, because "Jones has failed to explain . . . how the additional facts and clarifications she would have added materially varied from the allegations she had already asserted in the first two versions of her complaint.").

Outside of the "additional factual support and clarity" for Dyer's already-recognized claims, Dyer's only new allegations in his disparate treatment claim provide:

> 87. Beginning in 2020, Caucasian firefighters began to discriminate against Dyer after he refused Captain Favalora's demands for Dyer to boycott overtime work to harm NOFD. Favalora and other Caucasian firefighters engaged in a concerted effort to antagonize and harass Dyer by ostracizing him, refusing to speak with him, or leave any room when he entered. Dyer was also subjected to actions like tacks put in the tires of his bike, placing a "Firefighters for Trump" bumper sticker on the engine he was assigned while knowing that Dyer was not a Trump supporter because of Dyer's belief in racial equality, and Captain Favalora cutting off the

power to the treadmill Dyer was using, causing Dyer injuries to his knee. Dyer was subjected to rumors that he was violent and an angry black man. These firefighters routinely attempted to instigate conflict with Dyer.

88. Other African American firefighters of the same rank and lower did not treat Dyer in the same manner as the Caucasian firefighters and continued to treat him with respect and professionalism.

Rec. Doc. 32-2 at ¶¶ 87-88. But these allegations do not support any new disparate treatment claim, which requires sufficient facts to show: "(1) an 'adverse employment action,' (2) taken against a plaintiff '*because of* her protected status.'" *Cicalese*, 924 F.3d at 767 (citation omitted). If anything, these claims support Dyer's hostile work environment claim—a claim that the Court has already dismissed, and that Dyer does not reallege in his amended complaint. Moreover, as the Court previously concluded with respect to Dyer's hostile work environment claim: Dyer fails to make any plausible connection between these incidents and Dyer's race or color. *See* Rec. Doc. 15 at pp. 11-14. This flaw is fatal here too. These new allegations still indicate that Favalora and other Caucasian firefighter's actions occurred "<u>after</u> he refused Captain Favalora's demands for Dyer to boycott overtime work to harm NOFD." Rec. Doc. 32-2 at ¶ 87. In other words, there is no reading of these allegations that indicates the alleged harassment was because of Dyer's race; it was because of Dyer's refusal to boycott overtime work. Dyer also fails to provide any facts that would plausibly indicate that actions on behalf of these other firefighters could amount to an adverse employment action. Accordingly, Dyer's new amendments to his disparate treatment claim are unnecessary and futile, and the Court declines to permit Dyer leave to amend.

CONCLUSION

For the foregoing reasons, Dyer's Motion for Leave to File Amended Complaint is DENIED.

New Orleans, Louisiana, this 9th day of May, 2025.

_____
Janis van Meerveld
United States Magistrate Judge