UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| VARRICK DYER | * | CIVIL ACTION NO. 24-1702 |
| | * | |
| VERSUS | * | |
| | * | DIVISION: 1 |
| NEW ORLEANS CITY AND ROMAN | * | |
| NELSON, IN HIS OFFICIAL CAPACITY | * | |
| AS SUPERINTENDENT OF NEW | * | MAGISTRATE JUDGE |
| ORLEANS FIRE DEPARTMENT | * | JANIS VAN MEERVELD |
| ************************************ | * | |

ORDER AND REASONS

This is an employment discrimination lawsuit. The Court previously dismissed plaintiff's hostile work environment, retaliation, conspiracy, and due process claims pursuant to Federal Rule of Civil Procedure 12(b)(6) (Rec. Doc. 15) and dismissed on summary judgment plaintiff's race based disparate treatment claim arising out of the defendants' disciplinary actions against him (Rec. Doc. 43). Now before the Court is the defendants' Second Motion for Summary Judgment (Rec. Doc. 57), seeking dismissal of plaintiff's remaining claim arising out of the alleged promotion of a coworker. Although there may be fact issues with regard to plaintiff's prima facie case of discrimination, because plaintiff has presented no evidence that could convince a reasonable juror that defendants' non-discriminatory explanation for reassigning a White employee, and not plaintiff, to a different position was actually motivated by plaintiff's race, defendants are entitled to summary judgment in their favor. Accordingly, the Second Motion for Summary Judgment (Rec. Doc. 57) is GRANTED, and plaintiff's remaining claim is DISMISSED with prejudice.

Background

Plaintiff Varrick Dyer began employment with the New Orleans Fire Department (NOFD) on February 20, 1995, and was promoted to Captain on July 11, 2004. Pl.'s Resp. to Stmt. of Facts,

1

Rec. Doc. 59-1, at 2. Dyer is Black. The remaining claim in this lawsuit arises out of the reassignment of Captain Danny Simon to the position of special operations coordinator around April 2021 and Fire Education Officer in December 2022. Simon is White. He began his employment with NOFD three years before Dyer on March 22, 1992, but he was promoted to Captain after Dyer on September 4, 2005. Pl.'s Ex. 2, Rec. Doc. 59-3. Dyer contends that Simon was awarded the special operations coordinator and Fire Education Officer positions over Dyer because of his race.

The shuffle of positions followed the retirement of Chief of Special Operations Joseph Wheeler in April 2021. See Dunkley Decl., Rec. Doc. 57-4, at 3. Wheeler's position was filled by Chief Herman Franklin. Id. Around the same time, a position of special operations coordinator was created and Simon was assigned to the job.[1] Def.'s Corp. Depo, at 16, 24, Rec. Doc. 57-5. In that position, he worked a five-day, 56-hour average week.[2] Id. He was assigned a pool vehicle.[3] Id. at 31. But Simon's hourly pay rate did not change, and in fact, it remained lower than Dyer's.[4] Moreover, because Dyer was working more hours, Dyer earned significantly more than Simon:

---

[1] Dyer points out that the exact date Simon was assigned to act as special operations coordinator is unknown. Pl.'s Resp. to Stmt. of Facts, Rec. Doc. 59-1, at 5. This does not appear to be material issue.

[2] NOFD testified that this was the same schedule Simon worked in his prior position as the Urban Search and Rescue team leader managing the Canal Street collapse. Def.'s Corp. Depo, at 16, 24, Rec. Doc. 57-5. But NOFD also testified that "his work assignment was now instead of 24 hours on a HazMat unit, it was now five days a week as special operations coordinator." Id. at 24.

[3] Superintendent Nelson testified that he believed Simon had already been assigned a pool vehicle in his previous position. Def.'s Corp. Depo, at 31, Rec. Doc. 59-4.

[4] Records of Simon and Dyer's pay show that Simon's hourly pay rate was $22.73 for all of 2021 and $26.40 in 2022 until December 18, 2022. Ex. to Dunkley Decl., Rec. Doc. 57-4, at 10-11. Dyer's hourly rate was $24.84 for all of 2021 and $28.86 for all of 2022. Id. at 5-6. Dyer argues that the defendants' chart of pay rates, net pay, and the underlying paystubs upon which they were based should be stricken because the charts were not produced until the motion for summary judgment and the underlying paystubs were not produced until October 9, 2025, after defendants certified on August 29, 2025, that they had produced all responsive documents. Defendants respond that counsel produced the paystubs as soon as they were obtained from NOFD. They say that the documents were identified during the Dunkley-Edmonds deposition and were then obtained from the City custodian (who is not NOFD). These documents were produced before Superintendent Nelson's deposition and Dyer's counsel was able to question Nelson about them. As to the summary charts, defendants submit they are summaries of voluminous materials, allowed by Federal Rule of Evidence 1006. The Court agrees. Further, because the Court finds no prejudice resulting from the delayed production of the underlying paystubs and because Dyer has not challenged the accuracy of the charts, the Court denies the request to strike the exhibits.

between April 14, 2021, and December 18, 2022, Dyer earned $166,955.02 while Simon earned $107,506.98. Ex. to Dunkley Decl., Rec. Doc. 57-4, at 14. Dyer admits that Simon's reassignment to special operations coordinator was not a promotion in rank or a change in job classification. Pl.'s Resp. to Stmt. of Facts, Rec. Doc. 59-1, at 3.

      Dyer contends the position of special operations coordinator was only offered to Simon. Dyer Depo., at 27, Rec. Doc. 59-2. NOFD does not contest this,[5] claiming that it did not offer the position to Dyer because he did not have experience with the Urban Search and Rescue team, which is part of special operations,[6] and because he was consistently one of the highest overtime earners and it was assumed that Dyer would not want to reduce his hours to working only five days a week.[7] Def.'s Corp. Depo, at 27, 42, Rec. Doc. 57-5. But it also testified that "Dyer's name was never bought up for the special operations coordinator's position." Def.'s Corp. Depo., at 86-87, Rec. Doc. 59-4. Superintendent Nelson made the decision to assign Simon to special operations coordinator at the recommendation of Chief Bourdais, who was the deputy superintendent of operations and was managing special operations. Def.'s Corp. Depo, at 19, Rec. Doc. 57-5. Nelson also testified that Simon was already the Urban Search and Rescue task force leader and had been managing the Canal Street collapse. Id. at 25. Dyer, on the other hand, was a HazMat captain. Id. at 27. Though he had experience in heavy rescue earlier in his career, he never participated in urban search and rescue other than in his HazMat role. Id. But there was no minimum requirement or "special job specification" for the position, other than being a fire captain. Id.

---

[5] Indeed, NOFD testified that there was no job opening or bidding. Def.'s Corp. Depo, at 19, Rec. Doc. 57-5.
[6] Special operations encompasses heavy rescue, light rescue, hazardous materials, and urban search and rescue. Def.'s Corp. Depo, at 27, Rec. Doc. 57-5.
[7] The latter was the reason given to Dyer, who testified that in June or July 2021 he complained that he had not been considered for special operations coordinator, and Bourdais told Dyer he was not offered the position because he "like[d] working overtime," he was "one of the highest paid persons on the job," and they didn't think he wanted the position. Dyer Depo., at 37, 39, Rec. Doc. 57-6.

3

When Captain Vance was promoted in December 2022, a position for Fire Education Officer opened up. Def.'s Corp. Depo, at 16, Rec. Doc. 57-5. Simon was transferred to the Fire Education Officer position "to place him on a 40-hour workweek." [8] Id. at 16-17. The Fire Education Officer position comes with a 20% increase over the normal rate of pay. Id. at 24-25, 80; Dunkley Depo., at 35-36, Rec. Doc. 59-5. Superintendent Nelson explained that the pay increase is intended to make the new work schedule, without the opportunity for overtime, more attractive: "[w]hen you have employees who are used to working a 24-hour on, 48-hour schedule for 20, 30 years, they're normally not amenable to going to a five-day-a-week workweek where they have to work now every day, even though they do have nights and weekends off most of the time." Def.'s Corp. Depo, at 81, Rec. Doc. 57-5. Despite the increase in Simon's hourly rate following his assignment to Fire Education Officer, his net pay was significantly lower than Dyer's because of the difference in hours worked: Between December 18, 2022, and August 25, 2025, Dyer earned $333,185.17 while Simon earned $211,602.13. Ex. to Dunkley Decl., at 14, Rec. Doc. 57-4.

Moreover, Simon was still called a special operations coordinator and remained "under special operations." Def.'s Corp. Depo, at 29-30, Rec. Doc. 57-5. He was performing the same duties as he was before. Id. at 15. His role was like an assistant to the chief of special operations. Id. at 18.

Superintendent Nelson, testifying on behalf of NOFD explained:

> [i]f an employee is willing to work it as a detail, which requires a 56-hour week for them to make the same pay as they're making on the normal operations schedule, then we'll assign them that way. Or if there's a FEO position available, which is a

---

[8] Simon's personnel records indicate the hire date for his position as Fire Education Officer was June 18, 2023. Personnel Action Form, Rec. Doc. 59-7. But Simon's pay records show that starting on December 18, 2022, his hours worked were consistently 80 (i.e., 40 hours per week), when before they had been 112 (i.e., 56 hours per week). Dunkley Decl., Rec. Doc. 57-4, at 11. This suggests Simon began in the Fire Education Officer position on December 18, 2022.

4

> 40-hour workweek, then we'll use the FEO position. Our goal, from the time I became superintendent, is – was to look at all of the divisions for effectiveness and efficiency. . . . the divisions where we had division chiefs, we wanted all of them to at least have a staff or at least one captain FEO position under them as their staff.

Id. at 17-18. According to the NOFD, the practice is to allow division chiefs to select who they want to perform those roles, and Chief Bourdais recommended Simon so he was put in the position. Id. at 41. There was no selection process, and the position was not announced to the other firefighters. Id. at 40-41. Nelson testified that in other divisions, they do periodic interviews to gauge interest in Fire Education Officer positions or put out emails of interest. Def.'s Corp. Depo, at 20, Rec. Doc. 57-5. He noted "the challenge is that not many fire employees who are used to working a 24-hour rotating schedule want to work a five-day-a-week workweek." Id. Although they sometimes "just put people in [Fire Education Officer] positions based on [their] knowledge of their skills and abilities," he prefers "to do a process just so members don't feel slighted if they're not offered a position." Id. at 43. At the NOFD corporate deposition, Dyer's counsel questioned Nelson about a written policy for transfers that was not followed. Def.'s Corp. Depo., at 35-36, Rec. Doc. 59-4. Nelson testified that the policy did not apply to Simon's assignment to the Fire Education Officer position. Id. at 36, 38.

In April 2023, Dyer filed a charge of discrimination with the Equal Employment Opportunity Commission. EEOC Docs., Rec. Doc. 57-3, at 4. Among other things, he alleged that after Wheeler retired, Chief Bourdais named Simon as the interim special operations chief. Id. at 5. He admitted that Simon had more seniority, but pointed out that he had been a captain longer and had more time on the special operations team and as Hazmat captain. Id. He believed he had been passed up for the promotion due to racial discrimination and retaliation. Id.

Dyer received a Notice of Right to Sue and filed this lawsuit against the City of New Orleans and Roman Nelson, in his official capacity as Superintendent of the NOFD, on July 7,

5

2024. Some of Dyer's claims were dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Rec. Doc. 15. He filed an amended complaint, and defendants moved for summary judgment. The Court granted the motion in part, but allowed Dyer's claim for race based disparate treatment as to the promotion of Simon to proceed. Rec. Doc. 43. The parties conducted discovery and are set to go to trial on this remaining claim on January 12, 2026.

Presently before the Court is the defendants' Second Motion for Summary Judgment (Rec. Doc. 57). They argue that Dyer's discrimination claim must be dismissed because he cannot show he was subject to an adverse employment action when Simon was reassigned to special operations coordinator in April 2021. Further, they argue that Dyer cannot show that he was similarly situated to Simon. Additionally, they argue that they have articulated legitimate, non-discriminatory reasons for the assignment of Simon to the special operations coordinator position: to improve the effectiveness and efficiency of the NOFD, at the recommendation of Bourdais, and because Simon had necessary, relevant experience. They argue that Dyer cannot show that these reasons were pretextual or that race was a motivating factor for the reassignment merely because Bourdais and Simon were both White and because Bourdais participated in a successful race discrimination lawsuit against NOFD claiming that Black recruits that had scored lower on the entrance exam in 1991 were hired in preference to the White plaintiffs.

Dyer responds that he can establish an adverse employment action as a result of the special operations coordinator assignment because Simon only had to work five days a week with weekends and nights off and was given a take-home car. Further, Dyer points to Simon's promotion to Fire Education Officer, which resulted in a 20% pay increase. He argues that both assignments are at issue here, pointing out that he did not learn the exact title changes until discovery began in this litigation. Dyer argues further that he can establish he was similarly situated to Simon. He

points out that the Fire Education Officer assignment had only one requirement—that the person hold the rank of captain. Dyer submits that he and Simon both served as captain with identical job descriptions and responsibilities and with the same supervisors. Both were in special operations. Dyer argues further that defendants have not put forth a legitimate and nondiscriminatory justification for Simon's transfer to special operations coordinator and promotion to Fire Education Officer. In any event, he insists he can rebut defendants' claims because the position was created exclusively for Simon, NOFD did not follow its usual practices in promoting Simon to Fire Education Officer, Dyer has seniority as captain, and Dyer has experience in two of the special operations units.

In reply, defendants argue that Simon's reassignment to special operations coordinator and his transfer to the position of Fire Education Officer are separate and distinct employment actions that occurred one year and eight months apart. They submit there is no evidence to connect the two transfers. They also argue that Dyer has failed to establish a cat's paw theory because he cannot show racial animus on the part of Chief Bourdais nor can he show that Bourdais exerted leverage over Superintendent Nelson.

Law and Analysis

1. *Summary Judgment Standard*

Summary Judgment under Federal Rule of Civil Procedure 56 must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56. The movant has the initial burden of "showing the absence of a genuine issue as to any material fact." Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970). The respondent must then "produce evidence or designate specific facts showing the existence of a genuine issue for trial." Engstrom v. First Nat. Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir.

1995). Evidence that is "merely colorable" or "is not significantly probative" is not sufficient to defeat summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

"An issue is material if its resolution could affect the outcome of the action." Daniels v. City of Arlington, Tex., 246 F.3d 500, 502 (5th Cir. 2001). Thus, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Although this Court must "resolve factual controversies in favor of the nonmoving party," it must only do so "where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013) (quoting Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). The Court must not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

"Summary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant." Armstrong v. City of Dallas, 997 F.2d 62, 67 (5th Cir. 1993). Summary judgment is also appropriate if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

2. *Title VII Race Discrimination*

Title VII prohibits a covered employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). To prove race discrimination under Title VII in a case, such as this one, that relies entirely on circumstantial

evidence, a plaintiff must establish that he: "(1) is a member of a protected class, (2) was qualified for the position that he held, (3) was subject to an adverse employment action, and (4) was treated less favorably than others similarly situated outside of his protected class." Alkhawaldeh v. Dow Chem. Co., 851 F.3d 422, 426 (5th Cir. 2017). The "adverse employment action" of element three is not limited to ultimate employment decisions or economically adverse employment actions. Hamilton v. Dallas Cnty., 79 F.4th 494, 502, 504 (5th Cir. 2023). It is merely judicial shorthand for the phrase "compensation, terms, conditions, or privileges of employment." Id. In Hamilton, the court of appeals held that denying seniority privileges or awarding preferred shifts based on a protected characteristic can meet the standard. Id. at 505. "The days and hours that one works are quintessential 'terms or conditions' of one's employment." Id.

As to the fourth element, "[t]he 'similarly situated' prong requires a Title VII claimant to identify at least one coworker outside of his protected class who was treated more favorably 'under nearly identical circumstances.'" Alkhawaldeh, 851 F.3d at 426 (quoting Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259 (5th Cir. 2009). Thus, employees are considered "similarly situated when they (1) 'held the same job or responsibilities,' (2) 'shared the same supervisor or had their employment status determined by the same person,' and (3) 'have essentially comparable violation histories.'" West v. City of Houston, Tex., 960 F.3d 736, 740 (5th Cir. 2020) (quoting Lee, 574 F.3d at 260). But the "'nearly identical' standard is not equivalent to 'identical.'" Lee, 574 F.3d at 260 n. 25. To avoid summary judgment, the plaintiff must present "sufficient evidence that would permit a reasonable fact-finder to conclude that the plaintiff and other employees are similarly situated." Morris v. Town of Indep., 827 F.3d 396, 402 (5th Cir. 2016).

If a plaintiff establishes a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse actions taken. Id.

9

"The defendant need not persuade the court that it was actually motivated by the proffered reasons," but must only present evidence that "raises a genuine issue of fact as to whether it discriminated against the plaintiff." Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254 (1981). An employer is "allowed to be incorrect in its assessment of the facts it relies on" to support its adverse employment action, "but it is not allowed to have any discriminatory animus against [the employee] in making its decision." Vaughn v. Woodforest Bank, 665 F.3d 632, 636 (5th Cir. 2011).

If the defendant is able to produce a "legitimate, nondiscriminatory reason," the presumption of discrimination dissipates and "the plaintiff then bears the ultimate burden of persuading the trier of fact by a preponderance of the evidence that the employer intentionally discriminated against [the employee] *because of h[is] protected status*." Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003) (emphasis added). To do so, a plaintiff must put forward evidence rebutting each of the nondiscriminatory reasons the employer articulates. Vaughn, 665 F.3d at 637. A plaintiff may use two alternative methods to create a genuine issue of material fact as to whether he was discriminated against because of his race: (1) that the defendant's "reason is not true, but is instead a pretext for discrimination (pretext alternative);" or (2) that the defendant's "reason, while true, is only one of the reasons for its conduct, and another motivating factor is the [plaintiff's] protected characteristic (mixed-motives alternative)." Id. at 636 (quoting Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004)).

Where someone other than the decision maker is alleged to have had a discriminatory animus, the plaintiff may be able to "impute their discriminatory attitudes to the formal decision maker" under a "cat's paw" theory. Roberson v. Alltel Info. Servs., 373 F.3d 647, 653 (5th Cir. 2004) (quoting Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226 (5th Cir. 2000)). To do so,

10

plaintiff must "establish two conditions: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker.'" Id. (quoting Russel, 235 F.3d at 227).

3. *Dyer's Prima Facie Case*

Defendants argue that Dyer cannot establish that he was subject to an adverse employment action or that he was treated less favorably than other similarly situated individuals.

a. *Did Dyer experience an adverse employment action?*

Defendants argue that Simon's assignment to the position of special operations coordinator did not result in an adverse employment action to Dyer because it was not a new position and did not result in a pay increase. Dyer argues that the assignment to special operations coordinator and the assignment to Fire Education Officer should be viewed together and that the assignments amount to a promotion. He submits that with the special operations coordinator assignment, Simon was only working five days a week with nights and weekends off and was given a company car. Then with the Fire Education Officer assignment, he received a 20% pay increase and a forty-hour work week. Defendants insist the two assignments are separate and occurred 613 days apart.

The Court finds a material issue of fact precludes summary resolution of this element of Dyer's prima facie case of discrimination. The testimony of Superintendent Nelson might suggest to a reasonable juror that the two assignments were, in fact, a single reassignment to a position of assisting the chief of special operations, with pay and benefits awarded as the budget allowed. Indeed, when Simon was reassigned to Fire Education Officer with its 40-hour work week and 20% hourly pay increase, his duties remained the same and he was still called the special operations coordinator. Nelson explained "[t]he FEO position -- like I said, [Simon] was doing it as an hourly assignment until the FEO position became available and he was transferred into it." Def.'s Corp.

11

Depo., at 23, Rec. Doc. 59-4. He testified that Simon's Fire Education Officer position was "created because we wanted to have an FEO position in every division and we found we weren't able to do that because we weren't able to get the budgetary allocations." Id. at 14. Once Vance was promoted, "we had an open FEO position and we could use that to create a special operations coordinator position permanently under the special operation division." Id. at 14-15. "Simon's position, when it was created, it basically was as what we called the special operations coordinator, which is basically like instead of having an FEO in other divisions, having an FEO in the special operations division to work under the division chief." Id. at 14.

A juror could conclude that NOFD moved Simon into the role of assistant to Chief Bourdais in special operations and that his job classification was changed as the budget allowed until he eventually ended up with a 40-hour work week and a 20% increase in hourly pay. The various benefits cited by Dyer: the take home car, the schedule change, the eventual pay rate increase, might be considered by a reasonable juror to constitute terms and conditions of employment that Dyer did not receive but Simon did. Of course, NOFD suggests that Dyer preferred the pay structure he was on and shows that he made more money than Simon. But at this stage, the Court finds a genuine issue of material fact prevents summary resolution of the "adverse employment action" element of Dyer's prima facie case.

b. *Were Dyer and Simon similarly situated?*

Defendants argue that Simon and Dyer were not similarly situated because Simon had been a task force leader in the Urban Search and Rescue team, but Dyer had not. While a jury may ultimately agree with the defendants, the Court finds that a genuine issue of material fact precludes summary resolution of this element in defendants' favor. Simon and Dyer had similar tenures at NOFD (Simon's was slightly longer) and similar tenures as captain (Dyer's was slightly longer).

Notably, though, their seniority is not a claimed basis for the selection of Simon over Dyer for the special operations coordinator and Fire Education Officer positions. The only qualification was having the position of captain, which both Dyer and Simon satisfied. Both had experience in the special operations unit: Simon had experience in Urban Search and Rescue, Dyer had experience in Hazmat. The "similarly situated" requirement does not mean "identical." The Court finds that a reasonable juror might conclude that Dyer and Simon were similarly situated.

   4. *Defendants' Legitimate and Non-Discriminatory Explanation*

Defendants submit that Nelson reassigned Simon to improve effectiveness and efficiency. He also based his decision on the recommendation of Chief Bourdais, the Deputy Superintendent of Operations. And Dyer was not considered for the assignment because it was assumed that he would not want to forgo earning overtime. Defendants have met their burden to produce a legitimate, non-discriminatory reason for their decision to reassign Simon.

Dyer argues that defendants' explanation is not worthy of credence. He points out that NOFD admits that there was no review of skills when promoting Simon and that the position was created exclusively for him. He claims that NOFD did not follow its usual practices in promoting him because there was no screening interview and no email was sent to captains to gauge interest. He argues that NOFD did not follow the official transfer policy (though he does not address NOFD's contention that the cited policy is inapplicable). He points out that NOFD testified that three captains on the HazMat unit all take care of administrative duties to help run the day-to-day of special operations, and Simon's new position is largely administrative. See Def.'s Corp. Depo, at 26, 45, Rec. Doc. 57-5. Finally, he submits that Dyer has seniority as captain and had experience in two Special Operations units (HazMat and, earlier in his career, heavy rescue). Id. at 26-27.

Dyer insists that the purported inconsistency in NOFD's reasons for promotion create a genuine issue of material fact.

The Court finds that even viewing the cited evidence in the light most favorable to Dyer, he cannot possibly show that NOFD's explanation is merely a pretext for discrimination. There is simply no basis from which to conclude that NOFD was motivated by a discriminatory animus. At best, Dyer had similar credentials that also made him eligible for the special operations coordinator and Fire Education Officer assignments. But there is no reason to doubt NOFD's explanation that it did not think Dyer would be interested because he was making so much money on overtime or that Simon's experience and role in Urban Search and Rescue and working made the difference. There is no dispute that Bourdais recommended Simon for the position. Although the NOFD might have put out an email to gauge interest in the position among other captains as it sometimes did for other such positions, its failure to do so does not suggest a pretext for racial discrimination. While another decision maker might have given the job to Dyer, there is no reason to suggest that race was a motivating factor.

Dyer testified that he believed NOFD had discriminated against him because the position was not offered to anyone else, because Simon was White and "that's what Armand Bourdais want[s]," and because Bourdais had previously sued the Fire Department "for reverse discrimination and everybody that he put around him is also white." Dyer Depo., at 26-27, Rec. Doc. 57-6. When asked if there were any other reasons, he responded "That's it." <u>Id.</u> at 27. Dyer does not rely on any of these reasons in opposing summary judgment, but the Court addresses them briefly.

First, the Court finds the failure to offer the position to anyone other than Simon does not have any racial component and cannot reasonably show that race was a factor in NOFD's decision.

As to the cited lawsuit, it was filed over 25 years ago in 1999. Bourdais v. City of New Orleans, No. CIV.A. 99-1434, 2005 WL 3801576, at *3 (E.D. La. Apr. 29, 2005). Bourdais and the other White plaintiffs alleged "that their date of hire was delayed because the City discriminated against them on the basis of their race by hiring African-Americans with lower scores on the written test as Fire Recruits in preference to them, pursuant to a 50%/50% racial hiring quota." Id. Bourdais was successful and was awarded damages. Id. at 20. Successfully vindicating a violation of one's civil rights is not evidence of racial animus.

And as to the assertion that "everybody" Bourdais "put around him is also white," the statement is vague and conclusory. What Dyer means by "everybody" and "put around him" is not discernible. Dyer does not claim, let alone show, that Bourdais regularly promotes White employees over equally qualified Black employees, that he excludes Black employees from activities or meetings, or any that he undertook any other action that could give context to Dyer's testimony and support an inference that racial animus was at play in the decision to reassign Simon. Even if Dyer relied on this testimony in opposition to summary judgment—which he does not—it could not support a jury's finding of racial animus.[9]

## Conclusion

The Court finds summary judgment in favor of the defendants is appropriate here because there is no evidence that could rebut defendants' proffered non-discriminatory reasons for

---

[9] Defendants submit that by arguing that Bourdais acted with a racially discriminatory motive when Superintendent Nelson made the decision to reassign Simon, Dyer is invoking a "cat's paw" argument without addressing the necessary elements: "(1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker." Roberson, 373 F.3d at 653 (quoting Russell, 235 F.3d at 227). As noted, Dyer's opposition to defendants' motion for summary judgment does not rely on the purported discriminatory animus of Bourdais, instead arguing that the defendants' reason is not legitimate (and is merely a pretext for discrimination) because of the alleged failure to gauge interest of other captains, failure to review skills, etc., discussed above. For the reasons discussed above, even if Dyer's testimony regarding Bourdais was considered, no reasonable jury could find Bourdais exhibited racial animus. Thus, the Court need not address whether Bourdais exerted influence over Nelson.

reassigning Simon, and not Dyer, to the positions of special operations coordinator and Fire Education Officer. Accordingly, defendants' Motion for Summary Judgment (Rec. Doc. 57) is GRANTED; Dyer's complaint is DISMISSED with prejudice.

New Orleans, Louisiana, this 12th day of December, 2025.

_____
Janis van Meerveld
United States Magistrate Judge